# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| SAUNWIN INTERNATIONAL EQUITIES | ) | |
| FUND LLC, | ) | |
|  | ) | Civil Action No. |
| **Plaintiff,** | ) | 17-11585-FDS |
|  | ) | |
| v. | ) | |
|  | ) | |
| DONVILLE KENT ASSET | ) | |
| MANAGEMENT INC., JASON DONVILLE, | ) | |
| and JORDAN ZINBERG, | ) | |
|  | ) | |
| **Defendants.** | ) | |
| _____) | | |
| _____ | ) | |
|  | ) | |
| TARA HOLBROOK, et al., | ) | |
|  | ) | |
| **Plaintiffs,** | ) | Civil Action No. |
|  | ) | 17-11631-FDS |
| v. | ) | |
|  | ) | |
| DONVILLE KENT ASSET | ) | |
| MANAGEMENT INC., JASON DONVILLE, | ) | |
| and JORDAN ZINBERG, | ) | |
|  | ) | |
| **Defendants.** | ) | |
| _____) | | |

## <u>MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS</u>

**SAYLOR, J.**

This is an action arising out of the allegedly fraudulent operation of an investment fund.

Plaintiffs were investors in MC2 Capital Canadian Opportunities Fund, LLC ("MC2 Canadian

Fund"), a hedge fund based in Cambridge, Massachusetts, that ostensibly specialized in

Canadian securities investments.  MC2 Canadian Fund was managed by two individuals, Yasuna

Murakami and Avi Chiat.

The complaints allege that defendants Donville Kent Asset Management ("DKAM"), Jason Donville, and Jordan Zinberg set up MC2 Canadian Fund in partnership with Murakami and Chiat as a scheme to allow defendants to offer securities in the United States without being properly registered or licensed.  The fund failed, partly due to risky trading and partly due to outright theft by Murakami.  Murakami has since pleaded guilty in federal court to one count of wire fraud, and both men have been sued by the Securities and Exchange Commission for securities fraud.

Defendants have moved to dismiss the complaint, contending that they were merely consultants to Murakami and Chiat and that they cannot be held responsible for their actions.  At this stage, of course, the issue is not what actually happened; it is whether the allegations of the complaints are sufficient to survive dismissal.  The core of the present dispute is whether the complaints have adequately pleaded the existence of a partnership between defendants and Murakami and Chiat.  For the foregoing reasons, the Court finds that they have.  However, the complaints fail to allege the existence of an actionable breach of fiduciary duty, and the claims arising out of such a claimed breach will be granted.  The motions to dismiss will be otherwise denied.

## I.   Background

The following facts are as set forth in the amended complaints.[1]

### A.   Factual Background

Saunwin International Equities Fund LLC, Tara Holbrook, and other named plaintiffs were investors in MC2 Canadian Fund.  The fund was co-founded in 2011 by Yasuna Murakami

---

[1] Because plaintiffs have filed two separate complaints that are essentially identical to one another, unless otherwise noted, all citations will be to the complaint filed in the *Saunwin* action, No. 17-cv-11585.

and Avi Chiat, who were residents of Cambridge and Wellesley, Massachusetts, respectively. (Am. Compl. ¶¶ 37, 42).  Murakami has never had a securities license and has never been registered with the federal or Massachusetts securities regulators.  (*Id.* ¶ 37).  Chiat was registered with the Financial Industry Regulatory Authority, Inc. and the Commonwealth of Massachusetts as a representative of a brokerage firm, but those registrations terminated on July 18, 2007.  (*Id.* ¶ 43).

### 1.   **Murakami and Chiat's Fund Formation History**

### a.   **The MC2 Capital Partners Fund**

Murakami and Chiat had previously founded a separate hedge fund called MC2 Capital Partners Fund, LLC ("MC2 Partners Fund") in August 2007.  (*Id.* ¶ 46).  MC2 Partners Fund was based in Cambridge, Massachusetts.  (*Id.*).  Murakami and Chiat were investment advisers to MC2 Partners Fund and were responsible for day-to-day management of the fund.  (*Id.* ¶ 47).

Murakami and Chiat raised more than $2 million from investors in 2007, ostensibly for investment in MC2 Partners Fund.  (*Id.* ¶ 49).  To raise that money, Murakami and Chiat claimed that their investment strategy entailed "value investing."  (*Id.* ¶ 50).  However, they proceeded to engage in risky trades, such as margin trades and trades in high-volatility industries.  (*Id.* ¶ 52).  By the end of 2007, Murakami and Chiat had lost more than $600,000 of their investors' money.  (*Id.* ¶ 53).  The following year, they raised another $1.6 million.  (*Id.* ¶ 49).  However, again through risky trades, they lost another $2 million in investor money by the end of 2008.  (*Id.* ¶ 56).

In addition to trading losses, Murakami also stole money from MC2 Partners Fund. Between 2008 and 2010, he spent approximately $1 million in investor money on personal expenses and travel.  (*Id.* ¶¶ 57-58).  By the end of 2010, MC2 Partners Fund had only $45,372 in assets, or 1.2% of the total funds raised from investors.  (*Id.* ¶ 59).  That amount had dwindled

even further to less than $3,000 when regulators began investigating Murakami in 2016.  (*Id.*).

### b.      The MC2 Value Fund

In August 2008, approximately one year after the MC2 Partners Fund was created, Murakami and Chiat created a second fund, called the MC2 Value Fund.  (*Id.* ¶¶ 60-61).  Like MC2 Partners Fund, MC2 Value Fund was based in Cambridge.  (*Id.* ¶ 62).  MC2 Value Fund was also advertised as a "value investing" hedge fund.  (*Id.* ¶ 64).  Murakami and Chiat served as investment advisers to the fund and raised $535,000 in investments.  (*Id.* ¶¶ 66, 68).  However, that money again was lost through risky trades and outright theft by Murakami.  (*Id.* ¶¶ 64-65).  A portion of the fund's assets was also diverted to prop up MC2 Partners Fund.  (*Id.* ¶ 69).

### 2.      Donville and Zinberg

Donville Kent Asset Management, Inc. ("DKAM") is an investment-management firm based in Toronto, Ontario.  (*Id.* ¶ 30).  DKAM advertises itself to the public as an experienced asset-management firm that invests in Canadian securities.  (*Id.*).  Jason Donville, a resident of Oakville, Ontario, was its founder and principal.  (*Id.* ¶ 32).  Jordan Zinberg, who also resides in Ontario, was a senior employee and principal of DKAM.  (*Id.* ¶ 34).  Zinberg recruited new investors and advertised himself to prospective MC2 Canadian Fund investors as a "portfolio manager" based in the United States.  (*Id.* ¶¶ 34, 36).

At the relevant times, DKAM was not licensed, either as a broker-dealer or as an investment advisory firm, by federal or state securities regulators in the United States.  (*Id.* ¶ 31).  Similarly, neither Donville nor Zinberg was licensed, either as a broker-dealer registered representative or investment adviser, by federal or state securities regulators, although Donville had been licensed with FINRA in 2005 and was familiar with U.S. securities rules and regulations.  (*Id.* ¶¶ 33, 35).

3. **Donville and Zinberg Seek U.S. Investors**

In 2009, Donville and Zinberg started to explore the American investment management market.  (*Id.* ¶ 70).  They advertised their expertise in Canadian equity markets to attract American investors interested in diversifying their investments by purchasing Canadian securities.  (*Id.*).  However, because they were not licensed in the United States, they initially declined to accept investments from American nationals.  (*Id.* ¶¶ 71-73).

According to the complaints, to get around that problem, Donville and Zinberg sought American-based partners who could legally recruit American investors.  (*Id.* ¶ 74).  In May 2011, they agreed with Murakami and Chiat to offer investment management services to American investors.  (*Id.* ¶ 77).

4. **The Formation of MC2 Capital Canadian Opportunities Fund and MC2 Canada Management, LLC**

The MC2 Canadian Fund was a hedge fund created in May 2011.  (*Id.* ¶¶ 2, 94).  Like Murakami and Chiat's other two funds, it was Delaware limited liability company based in Cambridge.  (*Id.* ¶¶ 80, 94-95; Dormitzer Aff. Ex. A).  It was an investment vehicle with no employees.  (Am. Compl. ¶ 95).

The managing member and administrator of MC2 Canadian Fund was a limited liability company called MC2 Canada Capital Management, LLC ("MC2 Canada Management").  MC2 Canada Management was organized in Massachusetts on May 18, 2011.  (*Id.* ¶ 78).  The listed principal place of business was Cambridge, Massachusetts.  (*Id.* ¶ 79).

The complaints allege that "[t]he purpose of MC2 Canada Management was primarily to act as the ostensible administrative manager of the MC2 Canadian Fund and the vehicle through which Defendants and their partners charged the Fund investors asset management fees, and to conceal from U.S. federal and state securities regulators that Defendants were engaging in

5

securities and investment management business in the United States and Massachusetts without required licenses and/or registrations."  (*Id.* ¶ 80).  MC2 Canada Management provided various support services for MC2 Canadian Fund, such as maintaining and preserving fund records, reviewing subscription agreements, and providing office space.  (*Id.* ¶ 81).

The complaints further allege that the relationship between Donville and Zinberg, on the one hand, and Murakami and Chiat, on the other, was a partnership, in which they agreed to divide their roles and responsibilities.  (*Id.* ¶¶ 77, 85).  They allege that defendants used Murakami and Chiat as "'front men'" to avoid American securities regulators, and therefore did not disclose their names as part of the leadership of MC2 Canada Management or list their names as managers or control persons in documents filed with Massachusetts authorities.  (*Id.* ¶¶ 90-91).  They further allege that a consulting agreement, under which defendants were to be mere consultants to MC2 Canada Management and not investment managers, was a sham to further circumvent securities laws.  (*Id.* ¶¶ 92-93).

The complaints also allege that Donville and Zinberg had greater ownership, control, and responsibilities as to MC2 Canada Management than Murakami and Chiat.  They allege that Donville and Zinberg (acting through DKAM) were charged with "soliciting and recruiting" American investors, managing investment funds, and evaluating new Canadian investment opportunities.  (*Id.* ¶ 85).  Both Donville and Zinberg had decision-making authority for MC2 Canadian Fund investment decisions and authority for all trading.  (*Id.* ¶ 87).  Zinberg also had business cards made advertising himself as a portfolio manager for the "MC2 Capital Canadian Opportunities Fund" and listing a Cambridge address and Boston telephone and fax numbers (and an Ontario telephone number denominated "Direct").  (*Id.* ¶ 86).  Murakami and Chiat similarly solicited and recruited American investors; however, they were charged with running

the back office for MC2 Canadian Fund and providing administrative and marketing assistance for Donville and Zinberg.  (*Id.* ¶ 85).

According to the complaints, Donville, Zinberg, and DKAM owned 70% of MC2 Canada Management and received 70% of the investment management fees paid by MC2 Canadian Fund investors.  (*Id.* ¶ 88).  Murakami and Chiat owned only 30% of MC2 Canada Management and received 30% of the fees.  (*Id.* ¶ 89).

### 5.    Defendants' Marketing and Trading Activities

The complaints allege that Donville, Zinberg, and DKAM, assisted by Murakami and Chiat, prepared securities offering materials and distributed them to prospective investors in the United States.  (*Id.* ¶¶ 101, 125-127).  Those materials represented that DKAM would be managing the money and would be "responsible for the day-to-day operation" of the fund, and they repeatedly touted defendants' expertise as well-known, award-winning, and reputable Canadian investment managers.  (*Id.* ¶¶ 128, 144, 146).[2]

Using those materials, defendants alone and together with Murakami and Chiat offered and sold securities issued by MC2 Canadian Fund to American-based investors, including plaintiffs.  (*Id.* ¶¶ 103, 114).  Donville and Zinberg frequently traveled to the United States (to Boston, New York, and Santa Barbara) to meet potential investors, and appeared on American television stations.  (*Id.* ¶¶ 115, 116, 118).  During those presentations, they emphasized their expertise and proven track record of identifying profitable investment opportunities in Canadian financial markets.  (*Id.* ¶¶ 116, 119).

The complaints allege that the offering materials included several material omissions,

---

[2] Because plaintiffs refer to the offering materials in the complaint, the Court may consider them in ruling on the motions to dismiss.  *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).  They include the MC2 Canadian Fund's Private Placement Memorandum, LLC Agreement, and Subscription Agreement. (Dormitzer Aff. Exs. A, B, & C).

including the facts (1) that Murakami and Chiat had stolen funds from previous investors;

(2) that Donville, Zinberg, and DKAM were not licensed to engage in the securities business in

the United States; (3) that defendants had structured their participation in MC2 Canadian Fund to

circumvent state and federal securities laws; (4) that MC2 Canadian Fund lacked financial and

reporting controls; and (5) that Donville, Zinberg, and DKAM were being paid 70% of the fees

charged to MC2 Canadian Fund investors.  (*Id.* ¶ 135).  They further allege that the offering

materials also contained several material misrepresentations, including mischaracterizing

Murakami and Chiat as highly skilled investment managers and mischaracterizing Murakami and

Chiat as managers of the fund when in fact they were just administrators.  (*Id.* ¶ 136).

      The complaints allege that all sales of MC2 Canadian Fund securities were treated as

having been made by the partnership and all partners.  (*Id.* ¶ 105).  They allege that defendants

referred to Murakami and Chiat as their "partners," and vice versa.  (*Id.* ¶¶ 106-109, 122).

      In emails to a potential investor, Zinberg stated:

> Eligibility for our funds is based on residency as opposed to citizenship, and currently only Canadian residents can invest in our funds.  That being said, we run the exact same strategy for a firm called MC2 Capital based in Boston and that fund is open to both US and non-US investors.  If you would like me to connect you with our partners from MC2 in Boston please let me know and they would be happy to discuss the fund with you.
>
> . . . .
>
> MC2 is simply our distributor and back office for US clients, Donville Kent runs the money.  So yes, in essence investing in the MC2 Canadian fund would be the same as investing in the DKAM Capital Ideas Fund LP with the only differences being that MC2 reports in USD and uses all US based service providers (legal, fund accounting, etc.).

(*Id.* ¶ 109; *see also* Pl. Opp. to Mot. to Dismiss Ex. 2 at FAQ (explaining that "[u]nless you are a

Canadian resident, you cannot invest directly into the award-winning Donville Kent Capital

Ideas Fund" but the "MC2 Canadian Fund is the exclusive investment vehicle that allows

seamless access to the <u>same</u> strategy and active management," and the "U.S. back office and onshore fund is based in Boston"). Donville and Zinberg also described MC2 Canadian Fund as a fund that they managed, and referred to it as "their" fund. (*Id.* ¶ 120). The complaints also allege that defendants encouraged Murakami and Chiat to refer to them as partners, and to represent to potential investors that defendants would be managing investors' money, in order to lend their prestige and reputation to the fund and induce investment. (*Id.* ¶¶ 123, 129, 130).

The complaints allege that plaintiffs relied on those representations, and defendants' affiliation with the fund was a key factor in their decision to invest. (*Id.* ¶ 124, 130, 143). The complaints further allege that plaintiffs relied on defendants' advertised skill and reputation when deciding whether to invest in the fund. (*Id.* ¶¶ 144-149).

During the time the MC2 Canadian Fund was under defendants' management, at least 38 individuals invested at least $10 million, of which only $8,289,000 was actually transferred to the fund's trading account. (*Id.* ¶¶ 141-42). The rest was stolen by Murakami from the fund's bank account. (*Id.* ¶ 142).

Defendants managed the fund from its inception until May 2015. (*Id.* ¶ 152). They controlled and oversaw the fund's brokerage account and directed the trading for the fund. (*Id.* ¶ 153). They had discretion as to how to invest the money. (*Id.* ¶ 154). The complaints allege that defendants "received fees likely exceeding $1 million, from the MC2 Canadian Fund investors' money" and that "[i]n the last seven months of their management of the Fund alone, Defendants received in excess of $242,000 in fees." (*Id.* ¶ 158).

### 6.    <u>Suspicious Activity in the Fund</u>

The complaints further allege that Donville, Zinberg, and DKAM became aware of highly suspicious conduct that was strongly indicative of misconduct. (*Id.* ¶ 173). As an example, they cite Murakami's two initial deposits to the fund, totaling $250,000, which did not

come from investors but from his previous, failed MC2 Value Fund.  (*Id.* ¶¶ 174-175).  They further allege that it was a "major red flag" that Donville, Zinberg, and DKAM did not have access to MC2 Canadian Fund's bank account, where money from investors was initially deposited, and that Murakami was actively seeking to exclude defendants from knowing the amount, timing, and destination of new investors' deposits.  (*Id.* ¶ 165-166, 176, 185, 189).

In December 2014, an investor requested a complete withdrawal from MC2 Value Fund and MC2 Canadian Fund.  Murakami withdrew the entire amount ($963,753) from the MC2 Canadian Fund alone.  (*Id.* ¶ 178).  The complaints allege that Murakami falsely told Donville, Zinberg, and DKAM that the money had gone to several MC2 Canadian Fund investors, and defendants failed to verify that claim despite the suspiciously large withdrawal.  (*Id.* ¶ 179).  In another instance, in May 2014, Murakami wired $475,000, or 5% of the total value of MC2 Canadian Fund, from the brokerage account to an account he controlled in the name of MC2 Canada Management, and wired $20,750 directly to Chiat.  (*Id.* ¶ 192).  Murakami told Donville, Zinberg, and DKAM that the money was going to an investor, but defendants never confirmed that claim despite the large withdrawal.  (*Id.* ¶ 193).

The complaints allege that between 2011 and 2016, MC2 Canada Management defrauded investors by sending them false tax documents, inflated individual account statements, false and misleading Schedule K-1s, and fictitious reports of the fund's performance.  (*Id.* ¶¶ 160-162).  Donville, Zinberg, and DKAM never inquired into MC2 Canadian Fund's accounting or took steps to implement adequate controls, despite the fact that they were partners of Murakami and Chiat and managers of the MC2 Canadian Fund.  (*Id.* ¶¶ 171, 187).

### 7.   <u>Defendants Allegedly Walk Away</u>

On February 27, 2015, defendants gave notice that they were terminating their relationship with MC2 Canada Management and MC2 Canadian Fund, which became effective

90 days later.  (*Id.* ¶¶ 195, 200).  According to the complaints, despite having represented to investors that they would be managing the money in the fund, they never told investors that they were leaving.  (*Id.* ¶¶ 197-198).  At that time, according to the complaints, there was enough money in the fund for the investors to withdraw their investments in full.  (*Id.* ¶ 201).  Indeed, Chiat himself did so as soon as he learned that DKAM would cease managing the money, also warning family and friends to withdraw their investments.  (*Id.* ¶ 202).

By May 2015, Murakami was the only one left in charge.  (*Id.* ¶ 204).  By the end of 2016, the fund was empty, the money having gone into Murakami's own pocket or been lost in bad trades.  (*Id.* ¶¶ 205-207).  Between 2011 and 2016, he stole more than $6 million from the fund, most of it after defendants had departed.  (*Id.* ¶ 206).

Investors did not learn that defendants were not, in fact, managing the fund until long after defendants' departure, and in many cases not until actions against Murakami and the fund by Massachusetts regulators were reported in the media.  (*Id.*¶ 208).  Eventually, federal criminal charges were brought against Murakami.  (*Id.* ¶ 211).  State and federal agencies brought civil suits against Murakami, Chiat, MC2 Canadian Fund, MC2 Canada Management, and other related entities for securities fraud.  (*Id.* ¶¶ 210, 212).

###    B.    Procedural Background

Plaintiff Saunwin International Equities Fund LLC filed the complaint in 17-cv-11585 on August 23, 2017.  Plaintiffs Tara Holbrook, Raymond Tung, Jeff Stanley, Catharine Mintzer, Herbert Weiss, Dave Micalizzi, Todd Patkin, Allan Huntley, Robert Greenfield, Peter Lloyd, Richard Smith, Dale Whitebloom, Richard Elkin, Steven Krugman, Lee Chartock, and Jonathan Weiss filed a similar complaint in 17-cv-11631 a week later, on August 30, 2017.

On December 19, 2017, plaintiffs filed an amended complaint in each case.  The amended complaints are essentially identical, and assert the same eleven counts:

(1) securities fraud, in violation of 15 U.S.C. § 78j(b) and SEC Rule 10b-5 (Am. Compl. ¶¶ 213-226);

(2) controlling persons liability, under 15 U.S.C. § 78t(a) (*id.* ¶¶ 227-234);

(3) violations of Mass. Gen. Laws ch. 110A, § 410(a) and (b) (*id.* ¶¶ 235-247);

(4) common-law fraud, under a theory of partnership liability (*id.* ¶¶ 248-260);

(5) aiding and abetting fraud (*id.* ¶¶ 261-275);

(6) aiding and abetting breach of fiduciary duty (*id.* ¶¶ 276-286);

(7) conspiracy (*id.* ¶¶ 287-293);

(8) breach of fiduciary duty (*id.* ¶¶ 294-302);

(9) negligent misrepresentations and omissions (*id.* ¶¶ 303-311);

(10) violation of Mass. Gen. Laws ch. 93A (*id.* ¶¶ 312-317);

(11) negligence (*id.* ¶¶ 318-323).

Defendants have moved to dismiss the amended complaints in each case.

## II.   <u>Standard of Review</u>

As a general matter, on a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations and footnote omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

"Dismissal . . . is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)) (internal quotation marks omitted).

Ordinarily, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). For that reason, "[g]reat specificity is ordinarily not required to survive a Rule 12(b)(6) motion." *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir. 1992). However, under Fed. R. Civ. P. 9(b), in cases "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The basic purposes of that requirement are (1) to give the defendants notice and enable them to prepare a meaningful response; (2) to preclude the use of a groundless fraud claim as a pretext to using discovery as a fishing expedition; and (3) to safeguard defendants from frivolous charges that might damage their reputations. *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 170 (D. Mass. 2003) (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987)); *see also McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228-29 (1st Cir. 1980).

Under the heightened pleading requirement of Rule 9(b), a complaint alleging fraud must state the time, place, and content of the alleged false or fraudulent representations. *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189-90 (1st Cir. 2006). The requirement applies both to general claims of fraud and also to "associated claims where the core allegations effectively charge fraud." *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009).

On a motion to dismiss a securities fraud claim brought under Section 10(b) and Rule 10b-5, the court must, as with any such motion, accept plaintiff's allegations as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). However, such claims are subject to heightened pleading requirements. When a plaintiff alleges misrepresentation or omission of a material fact, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). To plead scienter, the complaint must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A strong inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314.

Nonetheless, in evaluating the adequacy of a complaint alleging securities fraud, a court "cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence." *Miss. Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996)). Courts should look at the complaint "as a whole" and weigh "competing inferences" in a "comparative evaluation" of plaintiff's allegations and alternative inferences from those allegations. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *see also Tellabs*, 551 U.S. at 314. If "there are equally strong inferences for and against scienter," then the tie goes to the plaintiff. *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008) (quoting *ACA Fin.*, 512 F.3d at 59).

## III.   <u>Analysis</u>

The complaints are essentially identical, and will be treated together for the sake of

convenience.  In addition, the counts will be addressed out of order, in order to permit a more

logical sequencing of the analysis.

### A.   <u>Count 4:  Partnership Liability</u>

Count 4 alleges that defendants entered into a partnership with Murakami and Chiat to

offer financial services to American investors, including selling securities issued by MC2

Canadian Fund, and that therefore they are vicariously liable for the fraudulent actions of

Murakami and Chiat committed within the scope of the partnership.  (Am. Compl. ¶¶ 249-260).

Massachusetts has adopted the Uniform Partnership Act, codified at Mass. Gen. Laws ch.

108A, § 1 *et seq.*  Under the law, a partnership is defined as "an association of two or more

persons to carry on as co-owners a business for profit."  *Id.* § 6; *see Andrews v. Elwell*, 367 F.

Supp. 2d 35, 39 (D. Mass. 2005).[3]  Partners are jointly and severally liable for conduct

committed by their partners in furtherance of the partnership.  Mass. Gen. Laws ch. 108A, §§ 13,

15.

The statute also sets out various rules for determining the existence of a partnership.

Mass. Gen. Laws ch. 108A, § 7.  "Several factors are considered to determine if a partnership

exists.  A non-exhaustive list includes:  whether there is '(1) an agreement by the parties

manifesting their intention to associate in a partnership[,] (2) a sharing by the parties of profits

and losses, and (3) participation by the parties in the control or management of the enterprise.'"

*Kansallis Fin. Ltd. v. Fern*, 40 F.3d 476, 478-79 (1st Cir. 1994) (quoting *Fenton v. Bryan*, 33

---

[3] A corporation may be a partner in a general partnership.  *See* Mass. Gen. Laws ch. 4, § 7 (defining "person" to include "corporations, societies, associations, and partnerships" unless otherwise indicated); *see also Infusaid Corp. v. Intermedics Infusaid, Inc.*, 739 F.2d 661 (1st Cir. 1984) (discussing whether partnership or joint-venture law would apply between two corporations, and ultimately deciding to apply partnership law); *E. Elec. Co. v. Taylor Woodrow Blitman Constr. Corp.*, 11 Mass. App. Ct. 192, 197-98 (1981) (explaining that the Uniform Partnership Act, as adopted in Massachusetts, does not define "person," but that Mass. Gen. Laws ch. 4, § 7 does); *cf. Leventhal v. Atl. Fin. Corp.*, 316 Mass. 194, 198 (1944) (holding that a corporation cannot be a partner with one of its stockholders).

Mass. App. Ct. 688, 691 (1992)).  "Evidence that putative partners shared profits and losses establishes a prima facie case for a partnership."  *Andrews*, 367 F. Supp. 2d at 39 (citing Mass. Gen. Laws ch. 108A, § 7).

Partnership liability also can be incurred by holding oneself out as a partner of another person, under the principle of partnership-by-estoppel.  Mass. Gen. Laws ch. 108A, § 16; *Gosselin v. Webb*, 242 F.3d 412, 417 (1st Cir. 2001).  "[I]f the *only* evidence of 'holding out' consists of the use of a person's name in a business, even with that person's knowledge, the putative partner may escape liability as a matter of law."  *Gosselin*, 242 F.3d at 417 (citing *Standard Oil Co. v. Henderson*, 265 Mass. 322, 326 (1928); *Brown v. Gerstein*, 17 Mass. App. Ct. 558, 572 (1984)).  But where "there is significant evidence bearing on the 'holding out' elements beyond mere use of the putative partner's name," ordinarily the question should go to the factfinder and summary judgment for the putative partner is inappropriate.  *Id.* (citing *Atlas Tack Corp. v. DiMasi*, 37 Mass. App. Ct. 66, 69-70 (1994); *Brown*, 17 Mass. App. Ct. at 572; *see also Martin v. Stone*, 332 Mass. 540, 546 (1955).  "Conflicting evidence about the existence of a partnership must be resolved by a jury."  *Andrews*, 367 F. Supp. 2d at 39.

Defendants contend that "plaintiffs' colloquial 'partner' allegations are insufficient to establish the existence of a partnership or support partnership-based claims."  (Def. Mot. to Dismiss at 15).  But they ignore other substantial allegations in the complaints that suffice to state a claim for partnership liability.

The complaints allege that defendants agreed to become partners with Murakami and Chiat in order to offer investment management services to American investors.  (Am. Compl. ¶¶ 77, 100, 250).  They allege that the investor fees from MC2 Canadian Fund—the "profits" of the business of selling its securities—were split 70/30 between defendants on the one hand and

Murakami and Chiat on the other.  (Am. Compl. ¶¶ 88-89, 97).  And they allege that defendants participated in the management and control of the enterprise, by working closely with Murakami and Chiat to recruit investors and having complete discretion in managing the American investors' money.  (Am. Compl. ¶ 85).  They further allege that defendants were the predominant partners, and that Murakami and Chiat were limited to running the back office of the fund and acting as intermediaries for American investors.  (*Id.* ¶¶ 85, 88).  Those claims are supported by specific alleged facts tending to show that defendants knew they needed a partner to enter the American market; that they intended to make all the investing decisions for MC2 Canadian Fund and run it as a parallel, American fund to their DKAM Capital Ideas Fund; and that they pocketed the substantial majority of the fees earned by the fund.  (*Id.* ¶¶ 70-72, 74, 88, 109). Those allegations plausibly state a claim that the "consulting" agreement with DKAM was a sham, concealing what was in fact a partnership, in order to hide defendants' unauthorized securities activity from state and federal authorities.  *Cf. Burns v. Taylor*, 2017 WL 924061, *4-5 (Mass. Super. Ct. Feb. 8, 2017) (holding that there was a genuine issue of material fact as to whether two people who purported to be employees and received W-2s were in fact partners owed fiduciary duties).

Even if plaintiffs were solely relying on a partnership-by-estoppel theory, the allegations are still sufficient to survive a motion to dismiss.  The complaints allege more than just that defendants colloquially referred to Murakami and Chiat as "partners" and knowingly allowed Murakami and Chiat to refer to them that way.  (Am. Compl. ¶¶ 108-109, 122).  In emails to a prospective investor, reproduced in the complaint, Zinberg stated that "*we run* the exact same strategy [as DKAM Capital Ideas Fund] for a firm called MC2 Capital" and offered to "connect [the investor] with our partners from MC2."  (*Id.* ¶ 109 (emphasis added)).  The very next day,

Zinberg wrote: "MC2 is simply our distributor and back office for U.S. Clients, Donville Kent

runs the money.  So yes, in essence investing in the MC2 Canadian fund would be the same as

investing in the DKAM Capital Ideas Fund LP with the only differences being that MC2 reports

in USD and uses all US based service providers (legal, fund accounting, etc.)."  (*Id.*).  That

description of roles is more than a mere colloquial reference to a "partner."  Zinberg even had

business cards made up calling himself a "portfolio manager" of "MC2 Capital Canadian

Opportunities Fund," with MC2 Capital Management LLC's name and logo in large font on the

side; the only reference to DKAM was the domain name of his email address.  (*Id.* ¶ 86).

Whether the evidence actually supports those claims, of course, is not before the Court at

this stage.  However, because the complaints plausibly allege sufficient facts to support a claim

for partnership liability, the motions to dismiss will be denied as to Count 4.

### B.    Breach of Fiduciary Duty

Count 8 alleges that defendants breached their fiduciary duty to plaintiffs by, among

other things, making false or misleading statements, failing to disclose material facts, failing to

use reasonable care and competence to appropriately manage plaintiffs' investments, failing to

warn plaintiffs that their investments were subject to an undue risk of loss, and failing to inform

plaintiffs that they were no longer managing their money.  (Am. Compl. ¶ 301).

The complaints allege that such a fiduciary duty "arose independently in two ways":

a.  At all times material to this Complaint, Defendants were Plaintiff's investment
advisors and/or associated with investment advisors within the meaning and
contemplation of the securities laws of the United States and the State of
Massachusetts; and

b.  Plaintiff also placed trust and confidence in Defendants to oversee and manage
its investments in Canadian investment products.  Defendants had superior
knowledge regarding Plaintiff's investments in MC2 Canadian Fund, including
how investor money was handled and managed.  Defendants knowingly accepted
this trust and confidence from Plaintiff.  And, under the MC2 Canadian Fund's
offering documents, Defendants had discretion on investing Plaintiff and other

investors' money.

(*Id.* ¶ 296).  The "two ways" thus appear to be as follows:  a fiduciary duty to the investors

allegedly arose under the federal Investment Advisers Act and the Massachusetts Uniform

Securities Act ("MUSA"), and under Massachusetts common law.

The Investment Advisers Act of 1940 defines "investment adviser" in relevant part as

"any person who, for compensation, engages in the business of advising others, either directly or

through publications or writings, as to the value of securities or as to the advisability of investing

in, purchasing, or selling securities."  15 U.S.C. § 80b-2(11); *see* Mass. Gen. Laws ch. 110A,

§ 401(m).  An investment adviser owes a fiduciary duty to its clients.  *Sec. & Exch. Comm'n v.*

*Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see Hays v. Ellrich*, 471 Mass.

592, 601 (2015).[4]

Defendants argue that they had no fiduciary duty to plaintiffs because they at most owed

a duty to MC2 Canada Management or MC2 Canadian Fund, not to the individual investors.

They cite *Goldstein v. Securities & Exchange Commission*, 451 F.3d 873 (D.C. Cir. 2006), for

the proposition that "[t]he adviser owes fiduciary duties only to the fund, not to the fund's

investors."  *Id.* at 881.

In interpreting whether individual investors in a hedge fund could be considered "clients"

of the fund's advisers for the purpose of a registration exemption, the *Goldstein* court explained

that a person or entity advising a hedge fund would not be an "investment adviser" to an investor

---

[4] By statute, the MUSA "shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation."  Mass. Gen. Laws ch. 110A, § 415; *see Hays*, 471 Mass. at 602-05; *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 50-51 (2004).  Neither party argues that the MUSA should be interpreted differently from the Investment Advisors Act on this point, so the discussion below is confined to the federal law.

in that fund because it would not be providing advice to the investor "directly."  *Id.* at 879-80.[5]

The *Goldstein* court cited the Supreme Court's decision in *Lowe v. Securities & Exchange*

*Commission*, 472 U.S. 181 (1985), which had held that the existence of an advisory relationship

depended on the character of the advice rendered, such that an investment adviser is one who

"provide[s] personalized advice attuned to a client's concerns."  472 U.S. at 207-08.  The *Lowe*

court held that the petitioners' newsletters in that case were not regulated by the Advisers Act

because "they do not offer individualized advice attuned to any specific portfolio or to any

client's particular needs."  *Id.* at 208.  Applying that precedent to hedge funds, the *Goldstein*

court concluded that "[t]his type of direct relationship exists between the adviser and the fund,

but not between the adviser and the investors in the fund," because the "adviser is concerned

with the fund's performance, not with each investor's financial condition."  451 F.3d at 880.  The

court further noted that if the investors were owed a fiduciary duty and the fund were also owed

a fiduciary duty, the adviser could have a conflict of interest.  *Id.* at 881.

Subsequent cases have distinguished *Goldstein*, concluding that investment advisers of a

fund can sometimes have fiduciary duties to the investors.  *Sec. & Exch. Comm'n v. Lauer*, 478

F. App'x 550, 556-57 (11th Cir. 2012); *United States v. Lay*, 612 F.3d 440, 446-47 (6th Cir.

2010); *Claude Worthington Benedum Found. v. Harley*, 2013 WL 2458457, at *11 (W.D. Pa.

June 6, 2013); *Sec. & Exch. Comm'n v. Sentinel Mgmt. Grp., Inc.*, 2012 WL 1079961, at *12-13

(N.D. Ill. Mar. 30, 2012); *Goldenson v. Steffens*, 802 F. Supp. 2d 240, 267-68 (D. Me. 2011).

Those cases relied on particular features of the relationship between the adviser and the investor

that tended to show that the adviser was providing individualized advice.  *See Lauer*, 478 F.

---

[5] Another part of the Advisers Act requires investment advisers to register, but, until July 20, 2011, it exempted advisers who have "fewer than fifteen clients."  15 U.S.C. § 80b-3(b)(3) (2011).

App'x at 557 (adviser proffered advice directly to funds' investors when he "hosted meetings and teleconferences with investors" and "suggested in the Funds' newsletter that his market strategy could beat market returns"); *Lay*, 612 F.3d at 446-47 (only one investor in the fund); *Claude Worthington Benedum Found.*, 2013 WL 2458457, at *11 (adviser treated plaintiff as a "preferred investor" over other investors in the hedge fund); *Sentinel*, 2012 WL 1079961, at *13 (explaining that Sentinel was "not akin to a traditional hedge fund manager" because the investment agreements provided client-specific investment guidelines that Sentinel was bound to follow when making investment decisions and it told multiple investors that it could customize its portfolios to meet the investors' particular needs); *Goldenson*, 802 F. Supp. 2d at 268 (allegations that defendants had assumed the role of adviser by "meeting with them individually, reviewing their personalized investment objectives, recommending investments in funds tailored to their investment objectives, and promising to monitor the funds in their personal interest").

The existence of a fiduciary duty is a question of fact that depends on the circumstances, principally the nature of the advice given. *Goldenson*, 802 F. Supp. 2d at 267. Here, the allegations are not sufficient to state a claim that defendants directly gave plaintiffs any advice. The complaints allege that defendants personally met with some of the plaintiffs to encourage them to invest. But they do not allege that defendants reviewed potential investors' finances and investment goals and based their recommendations on those factors. Rather, the complaints allege that defendants marketed their fund generally, including on television, and promised to invest funds in parallel to the DKAM Capital Ideas Fund, not in any way tailored to particular investors' needs. Therefore, the allegations of the complaint are not sufficient to allege a breach of fiduciary duty arising from federal securities laws concerning investment advisers.

Fiduciary duties can, however, arise in other ways.[6]  Massachusetts also recognizes common-law fiduciary duties under certain circumstances.  To establish such a duty under Massachusetts law, a plaintiff must show "at least that the relationship was one of trust and confidence; that the plaintiff[ ] relied upon the specialized knowledge or judgment of [the defendant]; and that [the defendant] was aware of the plaintiff['s] reliance upon [him]." *Davidson v. Gen. Motors Corp.*, 57 Mass. App. Ct. 637, 642 (2003) (citing *Broomfield v. Kosow*, 349 Mass. 749, 755-57 (1965)).  There does not appear to be any Massachusetts case holding that a fiduciary relationship may arise between an investment adviser and an investor. Massachusetts has, however, found that the relationship between a stockbroker and a customer "may be either a fiduciary or an ordinary business relationship," depending on the circumstances. *Pastos v. First Albany Corp.*, 433 Mass. 323, 331 (2001).  The *Pastos* court held that "the scope of a stockbroker's fiduciary duties [to a customer] in a particular case is a factual issue that turns on the manner in which investment decisions have been reached and transactions executed for the account," and that factors to consider include the "degree of discretion a customer entrusts to his broker" and whether "the broker holds himself out as an expert in a field in which the customer is unsophisticated." *Id.* at 332-37.  It cautioned, however, that if the customer "had merely alleged in very general terms that he trusted [the broker], that [the broker] was aware of his inexperience, and that he had transferred funds for [the broker] to invest on his behalf, that would be insufficient to establish that [the customer] and [the broker] had entered into a general fiduciary relationship." *Id.* at 336 (quotation and citation omitted).

---

[6] Neither party has argued that the federal and state statutory law concerning investment advisers is the sole body of law relevant to whether there is a fiduciary duty.  *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 501-04 (3d Cir. 2013) (explaining that some state courts have looked to the federal standard to determine whether there is a fiduciary relationship in the investment-adviser context, but others apply both state and federal standards).

Here, as noted, the complaints allege that the investors "placed trust and confidence" in defendants "to oversee and manage [their] investments"; that defendants "had superior knowledge regarding [their] investments"; that defendants "knowingly accepted this trust and confidence" from them; and defendants "had discretion on investing [their] money."  (Am. Compl. ¶ 296).  Those allegations are not materially different from the type of allegations that the *Patsos* court indicated would not be sufficient in the context of the relationship between a stockbroker and a client.  Under the circumstances—and even assuming that the principles of *Patsos* would apply in the context of the relationship between an investment adviser and an investor—the allegations are not sufficient to state a plausible claim for breach of a common-law fiduciary duty under Massachusetts law.

In their opposition, plaintiffs contend that defendants owed a fiduciary duty under Delaware law.  The MC2 Canadian Fund was organized as a Delaware LLC; MC2 Canada Management was the managing member of the LLC and investors were non-managing members. (Dormitzer Aff. Ex. A at 1, 32 ("The managing member of the Fund is MC2 Capital Canada Management, LLC . . . .  Upon the Managing Member's acceptance of a Subscriber's subscription, the Subscriber will become a Non-Managing Member.")).  Under Delaware law, managing members of an LLC owe a fiduciary duty to non-managing members.  *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 663 (Del. Ch. 2012).  And the complaints plausibly allege that defendants, in partnership with Murakami and Chiat, in fact controlled the LLC.

However, the complaints do not allege the existence of a fiduciary duty based on membership in an LLC, and it is not appropriate for a party to introduce entirely new theories of liability not spelled out in the pleadings in opposition to a motion.  Accordingly, the complaints will not be construed to allege that defendants owed the investors, who were non-managing

members of the LLC, a fiduciary duty in their role as managing members.

Accordingly, Count 8 will be dismissed for failure to state a claim.

## C.   <u>Count 1:  Exchange Act Violations</u>

Count 1 alleges that defendants violated the Securities Exchange Act of 1934, 15 U.S.C.

§ 78j(b), and Rule 10b-5.  Specifically, § 10(b) of the Exchange Act makes it unlawful "[t]o use

or employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe."  15 U.S.C. § 78j(b).  Pursuant to that section, the SEC has

promulgated Rule 10b-5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  A claim under Section 10(b) requires proof of six elements: "(1) a

material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a

connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

causation."  *Miss. Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5, 20 (1st Cir. 2011)

(quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d

751, 756 (1st Cir. 2011)).  "[S]ilence, absent a duty to disclose, cannot be actionably

misleading."  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202 (1st Cir. 1996), *superseded by

statute on other grounds as stated by Plumbers' Union Local No. 12 Pension Fund v. Nomura

Asset Acceptance Corp.*, 632 F.3d 762, 772 (1st Cir. 2011); *see Greebel v. FTP Software, Inc.*,

194 F.3d 185, 192 (1st Cir. 1999) (explaining that 15 U.S.C. § 78u-4(b)(2) has replaced Fed. R. Civ. P. 9(b) as the pleading standard for securities fraud).

Count 1 alleges that defendants failed to disclose various material facts in connection with the sale of securities to the investors in MC2 Canadian Fund.  Among other things, it alleges that defendants failed to disclose that the fund lacked adequate financial and reporting controls necessary to safeguard investors' money (because only Murakami had access to the deposit account); that defendants did not have the ability to oversee all of the fund's activities; that defendants did not have the proper registrations and licenses to engage in the American securities and investment management business, and structured their arrangement with the fund to circumvent federal law; that defendants in fact had control over MC2 Canada Management; and that defendants owned 70% of MC2 Canada Management.  (Am. Compl. ¶ 219).[7]

Count 1 further alleges that the offering documents made affirmative material misrepresentations, in that they falsely characterized Murakami and Chiat as "highly skilled" investors, when in fact their previous two funds had been disasters, and Murakami was not even licensed; that they mischaracterized Chiat's experience at Bear Stearns, where he was employed for only two months as a marketing assistant; and that they touted Murakami and Chiat as the managers of the fund, when in reality they were only in charge of "*administrative* management of the Fund, while Defendants managed the Fund investors' investments—i.e. selected the appropriate investments, decided when to purchase and when to sell investments and in what quantity, decided what investment method and techniques to employ, were in charge of trading,

---

[7] Count 1 also alleges that MC2 Canada Management had an improper compensation agreement with defendants—its undisclosed control persons—in violation of its fiduciary duties to the investors.  As set forth above, the complaint does not allege an actionable breach of fiduciary duty.  The Court need not address that issue as to Count 1 at this stage.

and so on."  (*Id.* ¶ 222).

Defendants contend that Count 1 should be dismissed because it does not allege any actionable omissions and failed to plead that defendants knowingly made material misrepresentations.  As to the alleged omissions, defendants argue that the offering documents clearly indicated that MC2 Canada Management was not registered under federal or state securities law (because it was exempt); that DKAM would have no role or authority with respect to the transmission of funds from the Fund's bank account to its brokerage account; and that defendants had no duty to disclose the percentage of fees that MC2 Canada Management had committed to pay DKAM.

Those arguments, however, mischaracterize the complaints.  Plaintiffs do not contend that the offering documents failed to disclose that MC2 Canada Management was not registered; they contend that the offering documents failed to disclose that defendants structured their participation MC2 Canadian Fund to hide the fact that they were engaging in the securities business in the United States without appropriate licensing or registration.  Nor do plaintiffs contend that the offering documents failed to disclose that Murakami was in charge of deposits; they contend that they failed to disclose that the fund lacked ordinary financial controls.

Defendants further contend that they did not make any of the alleged affirmative misrepresentations; rather, MC2 Canadian Fund did, and any assistance DKAM provided in preparing the materials was "subject to the ultimate control" of the fund.  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 147-48 (2011).  Furthermore, they contend that the allegations in the complaints are equivocal as to what misrepresentations were specifically made by defendants, as compared to Murakami and Chiat, and therefore the complaints fail to meet the heightened pleading standard of the PSLRA.

26

In *Janus*, the Supreme Court held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. at 142.  Because the fund in that case had an independent board of trustees that spoke for it, the Court held that that fund had ultimate authority over the statement.  *Id.* at 147.  Here, the complaints allege that MC2 Canada Management was the managing member of MC2 Canadian Fund and was authorized to make representations on its behalf.  (*See* Dormitzer Aff. Ex. A at 2).  They further allege that defendants had control over MC2 Canada Management and therefore that they are responsible for its misrepresentations.[8]

For the same reason, the complaints adequately allege who made the relevant statements for the purposes of the heightened pleading standard.  The complaints cite to particular statements and explain why they were misleading.  *See* 15 U.S.C. § 78u-4(b)(1).  They allege that the statements were contained in the offering materials.  And they allege that defendants prepared those materials with Murakami and Chiat.  Under the circumstances, that is sufficient.

Finally, defendants contend that the complaints fail to plead scienter as to the misrepresentations and omissions with the requisite degree of specificity.  The complaint must plead sufficient facts that create a strong inference of scienter.  15 U.S.C. § 78u-4(b)(2).  Here, the complaints allege that defendants knew they were not registered and licensed in the United States; that they knew such registrations and licenses were necessary to sell to American investors and refused to allow American investors to invest directly in the DKAM Capital Ideas

---

[8] Plaintiffs also point to allegations that defendants personally met with potential investors and urged them to invest.  (Am. Compl. ¶¶ 29, 103-104; Holbrook Am. Compl. ¶¶ 29-40, 114-115, 141).  Those allegations, however, do not meet the heightened pleading standard for securities fraud because they do not allege what was said or why it was misleading.

Management fund; that defendants funneled American investors to MC2 Canadian Fund as an equivalent investment to the DKAM Capital Ideas Fund; that they knew the Fund did not have proper controls; that they knew that Murakami and Chiat were not "highly skilled" investment managers with "extensive experience"; and that MC2 Canada Management was essentially a pass-through organization, as 70% of the fees that it earned went to defendants.  (Am. Compl. ¶¶ 12, 31, 33, 35, 71-72, 88, 109).  Taken as a whole, those factual allegations are sufficient to create a strong inference that defendants consciously structured their arrangement with Murakami and Chiat to avoid American securities laws, and that the consulting agreement with MC2 Canada Management was a sham to allow them to sell securities in the United States without the licenses that would otherwise have been required.  And they create a strong inference that defendants knew, at the very least, that Murakami and Chiat were willing to engage in questionable securities practices for a fee.[9]  Therefore, the complaints have adequately pleaded scienter in connection with the alleged misrepresentations and omissions.

    The motions to dismiss will be accordingly denied as to Count 1.

    **D.**    **Count 9: Negligent Misrepresentation and Omission**

    Count 9 alleges that defendants made statements to plaintiffs that they knew or should have known were false or misleading and that plaintiffs would rely on those statements when deciding whether to invest in MC2 Canadian Fund.  (Am. Compl. ¶¶ 304-305).

    Defendants make the same arguments for the dismissal of Count 9 as they do for Count 1. For the reasons discussed above, the motions to dismiss will be denied as to Count 9.

---

[9] As noted, the complaints allege that defendants knew that Murakami and Chiat were not qualified to manage investments.  (Am. Compl. ¶¶ 21, 191).  The factual predicate for that aspect of the claim is thin, and might not be sufficient, standing alone, to create a strong inference of scienter.  However, the Court need not address that question, as the other allegations are sufficient to satisfy the standard.

E.     **Count 2:  Control Person Liability**

Count 2 alleges that defendants acted as controlling persons over the partnership with

Murakami and Chiat and MC2 Canadian Fund within the meaning of Section 20(a) of the

Securities Exchange Act, 15 U.S.C. § 78t(a).  (Am. Compl. ¶¶ 227-234).

To state a claim for control person liability under Section 20(a), plaintiffs must

demonstrate, at minimum, an underlying violation of the same chapter of the securities laws by

the controlled entity, and control of the primary violator by the defendant.  *Aldridge v. A.T.*

*Cross Corp.*, 284 F.3d 72, 84-85 (1st Cir. 2002).  The potential ability or general power to

control is not sufficient; plaintiff must show the actual exercise of control over the entity

primarily liable.  *Id.* at 85.  "The term 'control' . . . means the possession, direct or indirect, of

the power to direct or to cause the direction of the management and policies of [an entity],

whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R.

§ 240.12b-2; *see Sheinkopf v. Stone*, 927 F.2d 1259, 1270 (1st Cir. 1991) (citing an older version

of the relevant Securities Act regulation).  "Control is a question of fact that 'will not ordinarily

be resolved summarily at the pleading stage.'"  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st

Cir. 2002) (quoting 2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th

ed. 2002)).  The complaint need only allege facts providing a reasonable inference of control.  *In*

*re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *24 (D. Mass. May 10, 2006).

Defendants argue that the allegations in the complaint do not meet this standard because

they allege no specific instance where defendants directed the "management and policies" of the

alleged partnership, and because Murakami and Chiat controlled 100% of the voting rights in

MC2 Canada Management.  But the complaints allege sufficient facts to support a reasonable

inference that defendants exercised control over MC2 Canadian Fund and MC2 Canada

Management.  First, they allege that defendants had decision-making authority for all investment

decisions and trading with regard to the Fund, which they actually exercised for several years. (Am. Compl. ¶¶ 87-88).  That represents significant control over the partnership, as the investing of the fund was basically the entire business of the enterprise.  And they allege that although Murakami and Chiat had formal control over MC2 Canada Management, that arrangement was a mere front to circumvent American securities laws.  (*Id.* ¶¶ 88-90).  As discussed above, those allegations are plausible (for example, Zinberg's own statement that MC2 Canada Management was a "back office" for operating the DKAM Capital Ideas Fund in the United States and defendants' receipt of a majority of the profits).  (*Id.* ¶¶ 88, 109).  If true, it is a reasonable inference that defendants actually had substantial control over MC2 Canada Management, and those allegations are therefore sufficiently plausible to survive a motion to dismiss as to Count 2.

## F.    Count 3:  Massachusetts Uniform Securities Act

Count 3 alleges that defendants' sale of securities issued by MC2 Canadian Fund constituted primary and secondary violations of the MUSA, Mass. Gen. Laws ch. 110A, § 410(a) and (b).

### 1.    Primary Violation

The MUSA imposes primary liability on any person who "offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."  Mass. Gen. Laws ch. 110A, § 410(a)(2).  To plead a primary violation, a complaint must allege that:  "(1) Defendants offered or sold securities in Massachusetts; (2) by making an untrue statement of, or omitting, any material fact; (3) Plaintiff did not know of the untruth or omission; and (4) Defendants knew or should have known of the untruth or omission."  *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 200 (D. Mass. 2012).  The MUSA applies only to an "offer [that] (1) originates from the

commonwealth or (2) is directed by the offeror to the commonwealth and received at the place to which it is directed . . . ."  Mass. Gen. Laws ch. 110A, § 414(a), (c).

Defendants first contend that the complaints fail to allege any material omissions or misrepresentations, as they argued with respect to Count 1.  The argument fails for the same reasons identified above.

Next, defendants contend that the complaints fail to allege a sufficient nexus to Massachusetts.  The complaints, however, allege that the offers for the sale of securities emanated from Massachusetts and that the actual sales took place in Massachusetts.  (Am. Compl. ¶¶ 104, 131, 237, 315; Holbrook Am. Compl. ¶¶ 25, 106, 115, 142, 248).  Murakami and Chiat were residents of Massachusetts, MC2 Canada Management was registered under the laws of Massachusetts with a principal place of business in Massachusetts, and MC2 Canadian Fund had its principal place of business in Massachusetts.  (Am. Compl. ¶¶ 37, 42, 78, 95). Furthermore, defendants personally directed potential investors to Massachusetts—"If you would like me to connect you with our partners from MC2 in Boston please let me know."  (*Id.* ¶ 109). That is plainly sufficient to establish the required nexus.

### 2.    <u>Secondary Violation</u>

The MUSA imposes joint and several (that is, secondary) liability on "[e]very person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale."  Mass. Gen. Laws ch. 110A, § 410(b).

Defendants argue that the complaints fail to plausibly plead sufficient facts to establish either a partnership or control-person liability.  Because the Court has concluded that the amended complaints plausibly allege both, this claim will not be dismissed.

G.     <u>Counts 5, 6, and 7:  Aiding and Abetting and Conspiracy</u>

Count 5 alleges that defendants aided and abetted the fraud perpetrated by Murakami and

Chiat by inducing plaintiffs to invest in MC2 Canadian Fund through making material

misrepresentations and omissions in the offering materials.  (Am. Compl. ¶ 262).  The particular

misrepresentations and omissions alleged are the same as those alleged in Count 1.  Count 5

alleges that defendants substantially assisted that fraud by allowing Murakami and Chiat to tout

their expertise as award-winning investment managers in the Canadian market as a key reason to

invest in the fund; helping to prepare the offering documents; communicating with potential

investors and encouraging them to invest; referring potential American investors to their

"partners" in Boston; and marketing the fund as being managed by defendants consistent with

the DKAM Capital Ideas Fund.  (*Id.* ¶ 272).  Plaintiffs allege that defendants' involvement gave

the fund a greater appearance of legitimacy and that without their involvement, plaintiffs would

not have invested.  (*Id.* ¶¶ 273-275).

Count 6 alleges that defendants aided and abetted the breach of fiduciary duties by

Murakami and Chiat by way of substantially the same activities that plaintiffs allege aided and

abetted their fraud.  (Am. Compl. ¶¶ 283-286).  And Count 7 alleges that defendants conspired

with Murakami and Chiat to perpetrate the fraudulent investment scheme, and alleges that

defendants' overt acts in furtherance of the conspiracy were the same activities plaintiffs allege

to have aided and abetted the fraud and breach of fiduciary duty.  (*Id.* ¶¶ 288-293).

For each of those claims, the complaints must allege (1) a third party's tort, breach, or

scheme; (2) that defendants knew of the tort, breach, or scheme; and (3) that defendants actively

participated in or provided substantial assistance to the commission of the tort, breach, or

scheme.  *E.g., Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 463 Mass. 50, 64 (2012) (aiding

and abetting fraud); *C Company, Inc. v. Hackel*, 2016 WL 3030912, at *2 (Mass. App. Ct. May

27, 2016) (aiding and abetting breach of fiduciary duty); *Kurker v. Hill*, 44 Mass. App. Ct. 184,

189 (1998) (conspiracy requires a common plan, knowledge, and affirmative steps).

"'Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to

act when required to do so, thereby enabling the breach [of a duty] to occur.'" *Mansor v.

JPMorgan Chase Bank, N.A.*, 183 F. Supp. 3d 250, 266 (D. Mass. 2016) (alteration in original)

(quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)).

Defendants do not contest, for the purposes of this motion, Murakami and Chiat's

underlying fraud, breach of fiduciary duty, or conspiracy.  Rather, defendants contend that the

complaints fail to allege knowledge of or substantial assistance in Murakami's theft, and that

plaintiffs cannot avoid those requirements by "reframing the scheme as supposedly pivoting on

misleading offering materials that induced them to invest in the fraud."  (Def. Mot. to Dismiss at

16).  But defendants are recasting plaintiff's claims into something that they are not.  A

complaint may state a claim that defendants aided and abetted or conspired in fraud or a breach

of fiduciary duty, even if there are other possible torts present in the fact pattern.  Here, the

complaints plausibly allege that defendants knew of the misrepresentations and omissions and

substantially assisted Murakami and Chiat by helping to prepare the materials and market the

fund.

To the extent defendants are arguing that their activities were not the proximate cause of

plaintiffs' injuries, that argument also fails, at least at this stage.  To establish proximate cause,

"a plaintiff must show that his or her injuries were within the reasonably foreseeable risks of

harm created by the defendant's negligent conduct."  *Staelens v. Dobert*, 318 F.3d 77, 79 (1st

Cir. 2003).  "Generally, intervening negligent conduct of a third person will not relieve the

original tortfeasor from liability where such conduct was reasonably foreseeable."  *Id.*; *see*

*Adams v. Congress Auto Ins. Agency, Inc.*, 90 Mass. App. Ct. 761, 768-69 (2016).  Ordinarily, that is a question for the jury.  *Staelens*, 318 F.3d at 79.  Here, plaintiffs allege, among other things, that the offering materials falsely characterized Murakami and Chiat as "highly skilled" investors, when in fact their past performance had been disastrous; failed to disclose the lack of corporate controls over investors' funds; and failed to disclose that defendants had designed the fund to circumvent state and federal securities laws and were engaging in the securities and investment management business in the United States without a license.  (Am. Compl. ¶¶ 263-264).  Those are facts from which proximate cause could be reasonably inferred.  Therefore, for the purpose of this motion to dismiss, the complaints adequately allege that the activities defendants are alleged to have aided and abetted proximately caused their injuries.

Defendants cite *Hightower v. Cohen*, 2009 WL 9042127, at *5-6 (E.D.N.Y. 2009), for the proposition that omissions and misrepresentations at the offering stage cannot be the basis for aiding and abetting subsequent misconduct.  In *Hightower*, the court held that even though the defendant lawyers had failed to disclose the criminal backgrounds of the people operating the fund while drafting the offering documents, they could not be liable for aiding and abetting fraud because the "operative fraud that caused plaintiffs' harm was the Ponzi scheme," of which the defendants were not aware.  *Hightower*, 2009 WL 9042127, at *5-6.  But even if that case were a controlling interpretation of Massachusetts law, there, the complaint itself alleged that the harm was due to the Ponzi scheme, and defendants were merely outside counsel who assisted the offering.  Here, the alleged scheme is essentially a partnership with Murakami and Chiat to evade federal and state securities law, and defendants were actively managing plaintiffs' money.  Just because the theft was *a* proximate cause of plaintiffs' losses does not mean that the fraudulent offering materials could not also be a proximate cause.

Accordingly, the motions to dismiss as to Counts 5, 6, and 7 will be denied.

**H.    Count 11:  Negligence**

Count 11 alleges that defendants breached their duty to use reasonable care in the management of plaintiffs' investments by failing to ensure that MC2 Canadian Fund had appropriate corporate, financial, and reporting controls; failing to warn plaintiffs that their investments were subject to undue risk of loss; and failing to notify plaintiffs when they terminated their relationship with Murakami and Chiat and ceased managing plaintiffs' money. (Am. Compl. ¶¶ 319-321).

Defendants contend that Count 11 should be dismissed because the complaints fail to allege that defendants owed them a duty of reasonable care or that defendants' actions were the proximate cause of their injury.

The Court has addressed the proximate cause issue above, and found that plaintiffs have adequately alleged that defendants' misrepresentations and omissions proximately caused their losses.  The allegations supporting proximate cause are even stronger for plaintiffs' negligence claims, as they include defendants' failure to inform plaintiffs that they would no longer be managing their money.

However, under Massachusetts law, a defendant does not generally owe a duty of reasonable care to protect a plaintiff from the actions of third parties absent the existence of a special relationship. *Adams v. Congress Auto Ins. Agency, Inc.*, 90 Mass. App. Ct. 761, 765-66 (2016).  Massachusetts courts have recognized several kinds of special relationships, including those between a residential landlord and his tenants, a college and its students, a common carrier and its passengers, and a hotel and its guests. *Whittaker v. Saraceno*, 418 Mass. 196, 197 (1994). "In deciding whether a special relationship exists between a particular plaintiff and defendant, [the court's] foremost consideration is whether 'a defendant reasonably could foresee that he

would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so.'" *Adams*, 90 Mass. App. Ct. at 765 (quoting *Irwin v. Ware*, 392 Mass. 745, 756 (1984)).

Here, as noted, the complaints fail to make adequate allegations that defendants and plaintiffs had a fiduciary relationship, and there are no other allegations from which a special relationship may be reasonably inferred. *See Clark v. Rowe*, 428 Mass. 339, 345-46 (1998) (explaining that dismissal of fiduciary duty claim as duplicative of a legal malpractice claim had not been preserved for appeal, but noting that it had been based on the same operative facts); *Pimental v. Wachovia Mortg. Corp.*, 411 F. Supp. 2d 32, 39-40 (D. Mass. 2006) (finding that negligence claim failed because plaintiff had failed to allege facts supporting a fiduciary duty).

Furthermore, "the economic loss doctrine bars recovery unless the plaintiffs can establish that the injuries they suffered due to the defendants' negligence involved physical harm or property damage, and not solely economic loss." *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 469 (2009). It is true that "[t]he economic loss doctrine does not bar recovery in claims of negligence against a fiduciary." *Oden v. U.S. Adjusters, Inc.*, 2014 WL 900722, at *3 n.5 (D. Mass. Mar. 7, 2014); *Szulik v. State Street Bank & Trust Co.*, 935 F. Supp. 2d 240, 271 n.11 (D. Mass. 2013). Again, however, the complaints do not adequately allege the existence of a fiduciary relationship.[10]

Accordingly, the Court will grant the motions to dismiss as to Count 11.

### I.     Count 10:  Chapter 93A

Count 10 alleges that defendants violated Mass. Gen. Laws ch. 93A, §§ 2, 9 and 11.

---

[10] Defendants also contend that the LLC agreement of MC2 Canadian Fund limited defendants' liability for claims of ordinary negligence. Because that argument was raised for the first time on reply, and because it appears unnecessary to reach the issue, the Court will not address the potential effect of that language.

(Am. Compl. ¶ 314; Holbrook Am. Compl. ¶¶ 325, 327).  Defendants' sole remaining argument against this claim is that it should be dismissed because it is "derivative" of plaintiffs' other claims.[11]  As the Court has explained, most of those other claims are viable at this stage, and the same allegations appear to support a claim for an "unfair or deceptive" business practice within the meaning of chapter 93A.  Therefore, defendants' motion to dismiss will be denied as to Count 10.

### J.     Personal Jurisdiction

Finally, defendants argue that Counts 8 (breach of fiduciary duty), 9 (negligent misrepresentation), and 11 (negligence) should be dismissed for lack of personal jurisdiction because the amended complaints do not allege any contacts with the United States (let alone Massachusetts) as to the "post-investment" claims.[12]

To establish personal jurisdiction in a diversity case, a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir. 1994).  A court may assert general jurisdiction over an individual defendant when he is a resident of the state in which the court is located and over a corporate defendant when its contacts with the state are "so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Specific jurisdiction, on the other hand, "is confined to adjudication of 'issues deriving from, or connected with, the very

---

[11] In its opening brief in support of its motion to dismiss, defendants also argued that plaintiffs had not complied with the demand-letter requirement under Mass. Gen. Laws ch. 93A, § 9, but they conceded in their reply that no demand letter was required because defendants did not maintain a place of business or keep assets in Massachusetts.

[12] Although Count 9 principally alleges the same material omissions and misrepresentations as Count 1, it also includes an allegation that defendants failed to inform plaintiffs that they had terminated their relationship with Murakami and Chiat and were no longer managing plaintiffs' money.  (Am. Compl. ¶ 307).

controversy that establishes jurisdiction.'" *Id.* (quoting von Mehren & Trautman, *Jurisdiction to Adjudicate:  A Suggested Analysis*, 79 HARV. L. REV. 1121, 1136 (1966)).  The specific personal-jurisdiction inquiry must take place on a claim-by-claim basis.  *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289 (1st Cir. 1999).  In determining whether the exercise of specific jurisdiction over a defendant comports with due process, the court must consider: (1) whether the claim directly arises out of, or relates to, the defendants' forum-state activities; (2) whether the defendants' in-state contacts represent a purposeful availment of the privilege of conducting activities in the forum state; and (3) whether the exercise of jurisdiction is reasonable.  *C.W. Downer & Co v. Bioriginal Food & Science Corp.*, 771 F.3d 59, 65 (1st Cir. 2014) (quoting *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002)).

All the claims in this case—including those primarily focused on defendants' activities after plaintiffs had trusted them with their money—arose specifically from defendants' relationship with Murakami and Chiat, both of whom were based in Massachusetts, and MC2 Canada Management, also based in Massachusetts.  The complaints allege that defendants specifically set up the partnership with Murakami and Chiat in order to serve American clients.  (Am. Compl. ¶¶ 70-77).  They further allege that defendants referred to MC2 Canada Management as "*our* distributor and back office for US clients."  (*Id.* ¶ 109).  They maintained those "clients" through February 2015, and the consulting agreement referred to in the complaints makes clear that defendants continued to perform services and receive payment pursuant to a contract explicitly governed by the laws of the Commonwealth of Massachusetts.  (Dormitzer Aff. Ex. D ¶ 4(g)).

Those allegations are sufficient as to contacts with the United States and Massachusetts that are directly related to plaintiffs' claims and purposeful availment of the laws of each

throughout their time managing plaintiff's money.  Defendants make no argument as to why it would be unreasonable to sue them here.  Therefore, the complaints sufficiently allege specific personal jurisdiction over defendants with respect to Counts 8, 9, and 11.

**IV.**    **<u>Conclusion</u>**

For the foregoing reasons, defendants' motions to dismiss are GRANTED as to Counts 8 and 11, and otherwise DENIED.

**So Ordered.**

/s/  F. Dennis Saylor        

F. Dennis Saylor, IV

Dated:  July 20, 2018                              United States District Judge